IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Michael B., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Case No.: 19-cv-50178 |
| v. | ) |
| | ) Magistrate Judge Margaret J. Schneider |
| Kilolo Kijakazi, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff's motion for summary judgment, Dkt. 12, is denied, the Commissioner's motion for summary judgment, Dkt. 17, is granted, and the decision of the ALJ is affirmed.

## BACKGROUND

A. Procedural History

Plaintiff filed an application for disability insurance benefits on August 11, 2013. R. 80. He alleged that he suffered from mental disorders as well as rheumatic heart disease. R. 81-84. Plaintiff's claim was initially denied on December 20, 2013, and upon reconsideration on July 15, 2014. R. 80, 105. Following a written request for a hearing, Administrative Law Judge ("ALJ") Jessica Inouye held a video hearing on October 8, 2015. R. 31-79. The ALJ heard testimony from Plaintiff as well as an impartial vocational expert. *Id.* On December 9, 2015, the ALJ issued a decision finding Plaintiff was not disabled. R. 10-30. Plaintiff appealed the decision, and on August 6, 2018, Magistrate Judge Johnston remanded the case, finding primarily that the ALJ cursorily rejected treating physician Dr. Jafry's opinion and the statements of several family members. R. 791-801.

On remand, the same ALJ held a second hearing on April 16, 2019. R. 700-59. Plaintiff appeared with counsel at the hearing but did not testify. *Id.* The ALJ heard testimony from psychologist Allen W. Heinemann, an impartial medical expert, Brian L. Harmon, an impartial vocational expert, and Plaintiff's wife. *Id.* On May 30, 2019, the ALJ found that Plaintiff last met the insured status requirement on December 31, 2015. R. 671. The ALJ further concluded that, through the date last insured, Plaintiff was limited to light work subject to various residual functional capacity (RFC) restrictions. R. 666-99. Plaintiff now seeks review of the ALJ's May 30, 2019 decision, which stands as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

---

[1] Kilolo Kijakazi has been substituted for Andrew Saul. Fed. R. Civ. P. 25(d).

B. Medical History[2]

On November 15, 2013, Plaintiff underwent a psychiatric consultative examination. R. 441-47. Psychologist Dianna Kucera found that Plaintiff had depression which manifested as anger and aggressive outbursts. R. 444. Dr. Kucera concluded that the mental status examination evidenced significant deficits in functioning. R. 445. Plaintiff performed in the below average range on digits forward and backwards, which indicated impairment in immediate recall. *Id.* In addition, his remote memory appeared to have deficits and his abstract thinking ability appeared to be impaired as well. *Id.* Dr. Kucera concluded that Plaintiff was not capable of managing his finances in the event he was awarded benefits. *Id.* She diagnosed Plaintiff with early onset dementia "of the Alzheimer's Type" with behavior disturbance. *Id.*

On November 25, 2013, Plaintiff underwent an internal medicine examination with consultative physician K.P. Ramchandani. R. 448-50. Overall, Dr. Ramchandani assessed Plaintiff with bipolar disorder along with a number of medical conditions. R. 450. Dr. Ramchandani also opined that on observation, Plaintiff was capable of handling funds in his own interest. R. 449.

On March 6, 2014, Plaintiff began to see licensed clinical professional counselor Charles Dudley. R. 460. Mr. Dudley noted that Plaintiff had poor focus and was easily frustrated and dysphoric, but with good memory. *Id.* At a follow up on March 18, 2014, Mr. Dudley noted that he would like to assess Plaintiff in more detail to rule out bipolar disorder. R. 462.

On March 31, 2014, Plaintiff was evaluated by psychiatrist Shahina Jafry, M.D. R. 458-59. Dr. Jafry's notes reflected that he had multiple medical issues, including dizzy spells, anger and irritation, mood swings, self isolating, lack of motivation, crying spells, feeling hopeless, decreased self-worth, racing thoughts, decision making difficulties, inability to complete projects, impulsive behavior, destructive behavior, anxiety symptoms, and panic attacks. *Id.* On a mental status exam, Plaintiff had good attention but was constricted, irritable, and anxious. R. 459. His motor activity was agitated, although his thought process was intact, and his speech was normal. *Id.* Dr. Jafry gave a global assessment of functioning (GAF)[3] score of 48, diagnosed him with major depressive disorder, changed Plaintiff's medications, and recommended psychotherapy. *Id.*

On April 3, 2014, Plaintiff saw Mr. Dudley for a follow up session. On that date, Mr. Dudley noted that Plaintiff was dependent on his wife and that he experienced negative thoughts of being inadequate. R. 463. Mr. Dudley also noted that Plaintiff had seen Dr. Jafry, who had diagnosed him with Major Depression, and medication changes were made. *Id.* They started working on identifying faulty thinking patterns and ways to correct them. R. 464. On April 14,

---

[2] This section is a summary of Plaintiff's medical history that is relevant to this appeal and does not represent Plaintiff's entire medical history.

[3] "The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level." *Yurt v. Colvin*, 758 F.3d 850, 853 n.2 (7th Cir. 2014) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 32 (4th ed. text revision 2000)). "A GAF between 41 and 50 indicates 'Serious symptoms' (e.g., suicidal ideation, severe obsessional rituals, frequent shop-lifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'' *Jelinek v. Astrue*, 662 F.3d 805, 807 n.1 (7th Cir. 2011).

2

2014, Plaintiff returned to Mr. Dudley for counseling. R. 465-66. Mr. Dudley stated that it did not appear that he would be able to be gainfully employed and recommended continued therapy. R. 466. He also noted that Plaintiff had a panic episode over the weekend. R. 465. On May 27, 2014, he was again seen by Mr. Dudley. R. 467. At that visit, Plaintiff's wife told Mr. Dudley that she felt that Plaintiff had improved and was more involved with the family. *Id.* On June 11, 2014, Plaintiff followed up with Mr. Dudley. R. 469-70. Mr. Dudley noted that Plaintiff was still dependent on his wife and required reassurance. R. 470.

On June 14, 2014, Plaintiff followed up with Dr. Jafry. R. 457. At that visit, Dr. Jafry noted that Plaintiff had been feeling better on medication and was active and alert. *Id.* In addition, his wife felt that Plaintiff's treatment was helping, and he had had no anger blow-ups. *Id.* His sleep, appetite, and energy had also improved. *Id.* Dr. Jafry noted that Plaintiff's memory was "so-so". *Id.* On July 28, 2014, Plaintiff saw Dr. Jafry again, at which time Plaintiff reported mood swings and periods of feeling "blah" and tired. R. 629. Dr. Jafry noted that his sleep was variable, and he had no panic attacks. *Id.* She also noted that he was "forgetful". *Id.* Dr. Jafry recommended that he continue psychotherapy and his medications. *Id.* Plaintiff apparently followed up with Mr. Dudley for psychotherapy through September 2014, but these records were not submitted in the administrative record. R. 682.

On April 28, 2015, Plaintiff returned to Dr. Jafry after a period of nine months. R. 616. Plaintiff reported that he felt a lot better, was active, calm, did better while on vacation, and had no anger outbursts. *Id.* In addition, his sleep was improved. *Id.* Dr. Jafry again noted that Plaintiff was forgetful. *Id.* As for other symptoms, Dr. Jafry noted that Plaintiff's anxiety was variable, mood swings come and go, and Plaintiff had a panic attack once a couple of weeks ago. R. 617. Dr. Jafry noted that Plaintiff's depression was "mild to moderate" and recommended that Plaintiff continue his medications and psychotherapy. R. 618.

Plaintiff followed up with Dr. Jafry on May 27, 2015, at which time Plaintiff's wife reported that he had been on edge the previous weekend. R. 619. However, Dr. Jafry noted that Plaintiff was "doing things better", feeling better than before, and was sleeping better. *Id.* Dr. Jafry again noted that Plaintiff was forgetful at times but that his memory, insight, and judgment were fair on a mental status exam. *Id.* Dr. Jafry further noted that he had no anxiety mood swings or panic attacks and depression was "mild." Dr. Jafry noted that Plaintiff was in therapy with Mr. Dudley, and that he should continue his medications. R. 621.

On May 12, 2015, Mr. Dudley submitted a statement opining that it was apparent that Plaintiff was dependent upon his wife, and that because his learning disabilities were never correctly diagnosed, he has struggled most of his life in society. R. 1101-02. Mr. Dudley further stated that Plaintiff would need to be on psychoactive medications the rest of his life in order to regulate his moods, anxiety, and feelings of worthlessness, and that his moods could change rapidly when under stress. *Id.* Mr. Dudley opined that Plaintiff felt inefficient in carrying out his responsibilities, and that he could appear to be irritable and argumentative. R. 1102-03. Overall, Mr. Dudley concluded that Plaintiff was disabled and would not be able to seek or find sustainable employment. R. 1103.

On June 2, 2015, Dr. Jafry completed a medical statement opining that Plaintiff had marked restrictions in his activities of daily living, extreme difficulty in maintaining social functioning, and extreme difficulty in maintaining concentration, persistence, or pace. R. 664. Dr. Jafry further opined that Plaintiff would be precluded from the ability to remember work-like procedures, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to change in a routine work setting. R. 665. Dr. Jafry stated that due to the chronic diagnosis of major depression and learning disabilities, Plaintiff would not be able to be gainfully employed and would require long-term treatment of psychotherapy and psychoactive medication. *Id.* Dr. Jafry further stated that Plaintiff would be likely to be absent from work 5 days or more per month, and off task 30% or more of the time. *Id.*

C. The ALJ Hearings

On October 8, 2015, Plaintiff testified at the first hearing before the ALJ that he could read some, but not all, words. R. 36. He stated that he was in a special education class in high school and later worked in the construction industry. R. 37. Plaintiff further testified that his wife accompanied him to doctor appointments because he did not understand doctors' explanations of his medical conditions. R. 40. He stated he felt that his mind kept him from working because when he would try to accomplish a task, he would become irritated because he could not remember things. R. 43. Plaintiff further stated that he used to have significant issues with anger. R. 47. Plaintiff did not testify at the second hearing.

Dr. Heinemann testified at the second hearing on April 16, 2019. R. 712. He stated that in his opinion, Plaintiff had moderate limitations in terms of interacting with others and maintaining consistent concentration, persistence, and pace, and that he would be limited to simple, routine, repetitive tasks, could have occasional contact with supervisors, coworkers, and the general public, and could function with usual rest breaks. R. 715. Dr. Heinemann further stated that his findings were supported by Dr. Jafry's notes, which consistently documented moderate limitations except for the June 2015 medical statement opining that his major depression had become recurrent and severe. *Id.* He also referenced medical findings after 2015 (the date last insured) that may have been more severe, but those findings were not relevant to the ALJ's analysis because they did not pertain to treatment during the relevant time period. R. 715-16 (referring to notes from a social worker who spoke with Plaintiff starting in 2017 and the consultative psychological examination done in January 2018). Dr. Heinemann also opined that he thought that Plaintiff had a learning disorder, but it did not appear that there was a deterioration in functioning as an adult. R. 717. In addition, he stated that a note signed by Dr. Jafry indicated that Plaintiff had the ability to understand, remember, and carry out short and simple instructions. R. 719. Ultimately, Dr. Heineman concluded, that he did not see the support in Dr. Jafry's notes for the conclusion that Plaintiff would "not be able to perform marked ratings for remembering work-like procedures, accept instructions, respond to criticism, respond appropriately to change in routine work setting . . . and the opinion that he would be unable to complete a normal workday five days or more per month." R. 719-20.

The vocational expert ("VE") also testified at the second hearing. In one hypothetical posted to the VE, the ALJ asked whether an individual of Plaintiff's age, education, and past work experience, who can only perform light work with no climbing of ladders, ropes, and scaffolds;

4

occasionally can perform postural activities of climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; avoid concentrated exposure to temperatures and hazards; who can learn, understand, remember, and carry out simple, routine, and repetitive work tasks with occasional work with supervisors, coworkers, and the general public, with usual rest periods and breaks, could perform Plaintiff's past work as a construction worker. R. 750-51. The VE testified that the individual could not perform such work but could perform other jobs in the national economy. R. 751. In another hypothetical, additional limitations were added to include that the individual should not work at a high production rate or a fast-paced work environment, should not be required to engage in any more than occasional reading at the early elementary level, and should do no more than occasional math. R. 752. The VE testified that such an individual could also perform those previously listed jobs. *Id.* Finally, the ALJ asked the VE if such an individual would be capable of performing those jobs if he would be absent for a few days sequentially. R. 754. The VE responded that those absences would limit competitive work, and absenteeism would likely only be tolerated on average one day per month. R. 755. In addition, the VE opined that the individual would need to be on task at least 85 percent of the workday, and that outbursts of anger would not be tolerated. R. 755-57.

The ALJ ultimately denied Plaintiff's request for benefits. R. 666-99. The ALJ found that Plaintiff had the following severe impairments: depression, anxiety, history of a learning disability/neurocognitive disorder, coronary artery disease (CAD), diabetes mellitus, hypertension, and dyslipidemia. R. 672. However, the ALJ found that through the date last insured (December 31, 2015), he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. R. 673. The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work. R. 676.

## STANDARD OF REVIEW

A reviewing court may enter judgment either "affirming, modifying, or reversing the decision of the [ALJ], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's factual findings are conclusive if they are supported by substantial evidence. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019). Substantial evidence "means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek*, 139 S. Ct. at 1154).

## DISCUSSION

Plaintiff contends that the ALJ erred in failing to give controlling weight to the opinion of his treating psychiatrist, Dr. Jafry. Specifically, Plaintiff contends that the ALJ overlooked important findings from Dr. Jafry and other supporting evidence, including the opinions of family members.

Substantial evidence supported the ALJ's decision to not give Dr. Jafry's opinion controlling weight. "For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. 404.1527(c)(2)). An ALJ must provide

5

"good reasons" for discounting the opinion of a treating physician. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). If an ALJ does not give a treating physician's opinion controlling weight, she must still determine what value it merits. *See* 20 C.F.R. § 404.1527(c); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). In assigning that value, the ALJ must "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c). "While we will not vacate or reverse an ALJ's decision based solely on a failure to expressly list every checklist factor, we do expect the ALJ to analyze the treating source's medical opinion 'within the multifactor framework delineated' in the regulation." *Ray v. Saul*, __ Fed. Appx. __, 2021 WL 2710377, *3 (7th Cir. 2021) (internal citation omitted); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (finding that generally acknowledging the regulatory factors is sufficient).

The ALJ articulated multiple valid reasons for assigning less than controlling weight to Dr. Jafry's June 2015 opinion. The ALJ reasonably noted that the "claimant's records until this time do not offer significant support for these severe and extreme limitations that Dr. Jafry assigned." R. 687. The ALJ's decision demonstrated that she thoroughly reviewed Plaintiff's medical history including Dr. Jafry's records and found that Plaintiff "frequently had normal mood and affect, the claimant was able to verbalize understanding, the claimant denied psychiatric symptoms, memory, recall, serial sevens were intact, and the claimant engaged in a number of activities of daily living." R. 688. In addition, the ALJ discounted Dr. Jafry's opinion because once Plaintiff started treatment, Dr. Jafry's notes were not consistent with serious or extreme limitations, thus his opinion was internally inconsistent with the records. *Id.* Dr. Heinemann made the same observation, testifying that "Dr. Jafry consistently documented moderate limitations" until he submitted his medical statement to Social Security, at which point he assessed almost all extreme limitations. R. 715. The ALJ also noted out that Dr. Heinemann pointed out that Dr. Jafry's records generally reflected moderate depression. R. 688. And, indeed, as the ALJ recognized, as of April 2015, Dr. Jafry's notes stated that Plaintiff's depression was mild. *Id.*

Moreover, the ALJ adequately accounted for the factors in 20 C.F.R. § 404.1527(c) when declining to afford Dr. Jafry's opinion controlling weight. As noted above, it is sufficient for an ALJ to analyze the factors, even if they do not systematically go through a checklist. *Campbell*, 627 F.3d at 308. The ALJ explicitly noted that Dr. Jafry had been treating Plaintiff since at least March of 2014 as well as her status as his psychiatrist. R. 679. The ALJ described the notes from Plaintiff's visits with Dr. Jafry in depth, inherently acknowledging the extent and frequency of the treating relationship. As already discussed, the ALJ also considered the consistency and supportability of Dr. Jafry's opinion with the record as a whole. R. 687-88.

The ALJ also considered the GAF score of 48 given to Plaintiff by Dr. Jafry on March 31, 2014 and gave it little weight. *Id.* The ALJ acted reasonably in doing so. "GAF scores . . . are useful for planning treatment and are measures of both severity of symptoms *and* functional level. Because the final GAF rating always reflects the worse of the two, the score does not reflect the clinician's opinion of functional capacity. Accordingly, nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (internal quotations omitted). In addition, the ALJ correctly stated (R. 688) that these scores have come to

6

be viewed as unreliable by mental health professionals. *See Largent v. Colvin*, 2016 WL 47918, *7 (N.D. Ill. Jan. 5, 2016) ("It is true that an ALJ is not bound by the GAF scores provided in record and that the fifth edition of the Diagnostic and Statistical Manual ("DSM") published in 2013 no longer uses GAF scores because of their unreliability) (citing *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014). The ALJ then gave greater weight to Dr. Heineman's opinion because she found his opinion to be more consistent with Plaintiff's true level of function and activity.

Plaintiff contends that Dr. Jafry's treatment notes are, in fact, consistent with her opinion and that the ALJ simply dismissed aspects of Dr. Jafry's treatment notes and ignored facts favorable to Plaintiff, including that Plaintiff had anger issues and problems with sleep, memory, judgment, panic attacks, and anxiety. Plaintiff is correct that Dr. Jafry's treatment notes include references to these issues. Indeed, the ALJ acknowledged that Dr. Jafry's notes included references to these more significant findings at times, such as crying spells, being angry and irritable, and destroying things. R. 679-80. However, when viewed chronologically, the ALJ's account of Dr. Jafry's treatment notes show the internal inconsistency between Dr. Jafry's opinion and the records. Over time as Plaintiff treated with Dr. Jafry, his mental health improved. The ALJ noted that at his visit on April 24, 2015 his major depressive disorder was noted as mild to moderate, Plaintiff reported that anxiety was variable, that he had mood swings that come and go, and that he had a panic attack a couple of weeks ago. R. 682 (referring to R. 617-18). The ALJ also noted that at his visit on May 24, 2015, Dr. Jafry's notes show that Plaintiff reported depression "sometimes," but denied anxiety, mood swings, and panic attacks. R. 683 (referring to 620-621). His major depressive disorder was noted as "mild." R. *Id.* (referring to 621). Dr. Jafry's opinion was written within weeks of these visits where substantial progress had been made and yet it documented severe limitations. The ALJ's finding that Dr. Jafry's records were inconsistent with her medical opinion was supported by substantial evidence.

Plaintiff also contends that the ALJ engaged in a "divide and conquer" strategy by failing to confront the consistency between the opinion of Dr. Jafry and the opinion letter authored by Mr. Dudley, the counselor that Plaintiff saw during the same time period he saw Dr. Jafry. Plaintiff's contentions do not comport with the record. Plaintiff's argument references the ALJ's suggestion that Mr. Dudley may have drafted Dr. Jafry's statement for signature. R. 688. However, that comment was merely made in reference to the fact that it seemed reasonable that it may have occurred, "given the moderate findings in [Dr. Jafry's] records as pointed out by Dr. Heinemann." *Id.* Contrary to Plaintiff's argument, the ALJ did consider Mr. Dudley's opinion letter, dated May 12, 2015, which found that Plaintiff was permanently disabled" and unable "to seek or find sustainable employment." R. 1103. Regarding this letter, the ALJ noted that Mr. Dudley's most recent treatment notes had not been provided, but to the extent treatment notes had been provided, they showed "a demonstrable and quick progression in improvement with medications and counseling." *Id.* It appears that the ALJ reviewed the only treatment notes from Mr. Dudley available to her (R. 511-21) and found that Plaintiff had seen success with treatment from Mr. Dudley as well. In any event, the ALJ was not required to compare Mr. Dudley's opinion with that of Dr. Jafry, but rather to sort out the conflicting evidence and make a disability determination. *See Sanders v. Colvin*, 600 Fed. Appx. 469, 470 (7th Cir. 2015) ("[A]n ALJ's job is to weigh conflicting evidence.") Here, the ALJ did what the remand order asked and used Dr. Heinemann's expertise to assist in evaluating the evidence. Dr. Heinmann recommended moderate limitations

across the board R. 714-15. As explained below, the ALJ, after considering all of the evidence in the record, slightly modified those restrictions in her RFC finding. R. 676.

Finally, contrary to Plaintiff's assertion, the ALJ did not err in evaluating Plaintiff's family members' and neighbors' statements. An ALJ's adequately explained credibility determination will be overturned only if it is "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 1013). In her order, the ALJ detailed the information provided by Plaintiff's family members in written statements, which included information about Plaintiff having outbursts and "crashes," where Plaintiff would stay in bed for several days straight. R. 689. The ALJ also provided information from a letter provided by neighbors that detailed issues such as "depression, anxiety and obsessive compulsive behavior." *Id.* The ALJ then explained her evaluation of these letters, noting, for example, regarding the letter from the neighbors, "[a]s noted in Dr. Heinemann's testimony, none of these obsessive behaviors were noted in the records." *Id.* The ALJ also pointed out that "none of the reports of the claimant's actions, outbursts, behavioral issues, etc. were reported in the records from April 2011 through March 2014." R. 690. The ALJ, however, did acknowledge that there were some medical records that included notations of some issues with his temper. *Id.* Ultimately, however, the ALJ "gave the claimant the benefit of every consideration" of these statements. *Id.* She then accounted for the reported conduct by limiting Plaintiff to "simple, routine, and repetitive work tasks, with occasional contact, no high-production or fast paced work environment, self-paced work, and meeting end of workday goals." *Id.* In other words, she added "no high-production or fast paced work environment, self-paced work, and meeting end of workday goals" to account for the reported "outbursts, anger, and moodiness." *Compare* R. 715 *with* R. 676, 690. Thus, the ALJ properly considered these statements, weighed them against other evidence in the record, and accounted for them by limiting Plaintiff further in her RFC than suggested by Dr. Heinemann. *See Amy v. Saul*, 2000 WL 6509339, * 2, n.1 (N.D. Ill. November 5, 2000) (citing C.F.R. § 494.1527(d)(2) ("Fashioning an RFC is a task assigned to the ALJ.")

Plaintiff does not dispute that the ALJ accounted for the limitations suggested by his family members. Instead, Plaintiff argues that the ALJ improperly suggested that their statements were not credible by showing "disdain" for Plaintiff's family members and by asking questions about who typed the statements that were submitted. Plaintiff's allegations regarding the ALJ's treatment of Plaintiff's family members are generalized and not borne out by the record. The ALJ appropriately managed the order of witnesses at the hearing and, at times, encouraged Plaintiff's wife to limit her testimony to the relevant time period (2011-2015). Plaintiff's claim that the ALJ discounted the written statements based on allegations that they were typed by someone else similarly lacks merit. The ALJ merely asked how the statements came about and who typed them and when Plaintiff's counsel responded, she accepted the answer that the individuals who wrote the letters typed their own letter. R. 710. Overall, The ALJ's written analysis of the family members' statements considered other evidence in the record and was supported by substantial evidence. R. 689-90.

8

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is denied, the Commissioner's motion is granted, and the decision of the ALJ is affirmed.

Date: October 1, 2021  ENTER:

*Margaret J. Schneider*
United States Magistrate Judge